IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOHN WOOD, RENE WOOD, AND ROBERT WOOD, | § § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION H-09-1390 |
| KATY INDEPENDENT SCHOOL DISTRICT AND BOARD OF TRUSTEES OF THE KATY INDEPENDENT SCHOOL DISTRICT, | § § § § § | |
| Defendants. | § § | |

**OPINION AND ORDER**

The above referenced cause is an appeal by Plaintiffs Robert Wood ("Rob") and his parents, John Wood and Rene Wood, of Texas Education Agency ("TEA") Special Education Hearing Officer Mary Carolyn Carmichael's February 7, 2009 decision[1] that Defendant Katy Independent School District ("KISD") had provided Rob, allegedly

---

[1] Copy attached to Plaintiffs' Amended Complaint (#8-1) and included in #67, the Certified Administrative Record ("CAR"), Vol. I at p.2. Specifically in denying all relief requested by Rob, the Hearing Officer concluded, #8-1, at p. 19 (electronic page no. 23),

> The educational program provided by KISD for Petitioner's 2006-2007 school year and proposed for 2007-2008 school year was appropriate, delivered according to the IEP, and resulted in progress for Petitioner during his attendance in the 2006-2007 school year. Petitioner received a meaningful educational benefit during the 2006-2007 school year and the program proposed for 2007-2008 was reasonably calculated to provide the same.

The Hearing Officer found in favor of KISD on all issues raised during the hearing.

impaired by dyslexia according to his parents and undisputedly learning disabled, with a free, appropriate public education ("FAPE") in compliance with the Individuals With Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1491, specifically § 1415(i)(2)(a).[2]  Plaintiffs complain that KISD did not comply with the IDEA's procedural requirements and failed to design an individualized education program ("IEP") reasonably calculated to enable Rob to receive educational benefits.  Pending before the Court are amended cross motions for summary judgment filed by (1) Plaintiffs John Wood, Rene Wood, and Robert Wood (instrument # 102) and (2) by the KISD (#103).

For the procedural history of this case, the Court refers the parties to its Opinion and Order of September 12, 2012 (#100).

Moreover, because initially the massive record for summary judgment was not organized in any accessible way to allow the Court to locate specific documents, because much of it and the parties' earlier motions for summary judgment addressed numerous extraneous matters that were not relevant to Plaintiffs' remaining IDEA claims and included documents not part of the administrative record (#67) provided by TEA, to which the Court has restricted this appeal (see

---

[2]  The IDEA's purpose is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).

#65 and 100), because citations to the record were inconsistent and unclear or incorrect, and because the parties failed to address significant elements essential to Plaintiffs' claims, *inter alia*, in that September 12, 2012 Opinion and Order the Court instructed the parties to file amended motions of not more than 50 pages addressing the two key issues: whether the state complied with the IDEA's procedural requirements[3] and whether the IEP was reasonably calculated to enable Rob to receive educational benefits.[4]   *See*

---

[3]  *See generally,* 20 U.S.C. § 1415.  For example, § 1414(b)(1) identifies as required procedures,

> An opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent educational evaluation of the child.

While a procedural violation by itself may support a "finding that, as a matter of law the school has failed to provide" a FAPE, to be actionable, the procedural violation "must result in the loss of an educational opportunity." *Adam J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 811 (5th Cir. 2003), *citing Buser by Buser v. Corpus Christi Indep. Sch. Dist.*, 51 F.3d 490, 493 (5th Cir. 1995).

[4]  At meetings attended and participated in by parents, who play a significant role, teachers, other school personnel and educational experts, individualized IEPs are developed by agreement and contain a statement of the special education, related services, and accommodations that the school district must provide to the child with disabilities.  20 U.S.C. § 1414(d)(1)(B) and (A); *Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 395 (5th Cir. 2012).  The parents' "right to provide meaningful input is simply not the right to dictate an outcome and obviously cannot be measured by such," *White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 380 (5th Cir. 2003), *citing Blackmon v. Springfield R-XII Sch. Dist.*, 198 F.3d 648, 656 (8th Cir. 1999)(where no "serious hamper[ing]" of parent's opportunity to participate in the formulation process, IDEA

*Richardson ISD v. Michael Z.*, 580 F.3d 286, 293 (5th Cir. 2009)(The scope of judicial review of an IEP is limited to two questions: "has the state complied with the procedural requirements of the IDEA" and "is the [IEP] developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?"), *citing Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 206-07 (1982), *cert. denied*, 522 U.S. 1047 (1998)). While KISD has complied with the Court's order, Plaintiffs' submission is still voluminous, contains documents that are not part of the official administrative record, an absence of citations to the record to support their assertions, and irrelevant

---

requirement of meaningful parental input satisfied notwithstanding that parent's desired program not selected); *Lachman v. Illinois St. Bd. of Educ.*, 852 F.2d 290, 297 (7th Cir.)("[P]arents, no matter how well-motivated, do not have a right under [the IDEA] to compel a school district to provide a specific program or employ a specific methodology in providing for the education of their handicapped child."), *cert. denied*, 488 U.S. 925 (1988). Here Plaintiffs' request that KISD use the Orton-Gillingham methodology, recommended by the psychologist at Pine Ridge School, for Rob's disabilities did not require KISD to do so. Once the IEP is created, the school district must then implement the IEP and periodically review it. *Hovem*, *id.* Parents must be allowed to raise any complaints they have to the identification, evaluation or placement of the child or to whether the child was receiving a FAPE as required under 20 U.S.C. § 1415(f)(3)(E)(i). *Id.* If the parents are not satisfied with the school district's effort to resolve any issues, they may request an impartial due process hearing before an independent, state education agency Hearing Officer pursuant to 20 U.S.C. § 1415(f)(1)(A). *Id.* If still aggrieved after exhausting these administrative procedures, the parents and child may "bring a civil action with respect to the complaint" in state or federal court under 20 U.S.C. § 1415(i)(2)(A). *Id.*

and/or incompetent summary judgment evidence.[5]  The Court does the best it can with the current record and again reminds the parties that it is not obligated to "sift through the record in search of evidence" to support a party's opposition to a motion for summary judgment.  *Forsyth v. Barr*, 19 F.3d 1527, 1533  (5th Cir. 1994). Rather the nonmovant must identify evidence in the record and demonstrate how it supports his claim.  *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

### Standard of Review

### Summary Judgment Under the IDEA:  Review of

### Hearing Officer's Decision

When addressing a summary judgment motion appealing a hearing officer's decision under the IDEA, the court reviews the administrative record of the due process hearing and examines new evidence at the request of any party.   *HISD v. V.P. ex rel. Juan P.*, 582 F.3d 576 (5th Cir. 2009), *cert. denied*, 130 S. Ct. 1892 (2010)(No. 09-841); *Cypress-Fairbanks ISD v. Michael F.*, 118 F.3d 245, 252 (5th Cir. 1997)(*citing Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982), *cert. denied*, 522 U.S. 1047 (1998)).  When no new evidence is presented

---

[5] *See* KISD's objections and response to Plaintiffs' revised statement of facts and revised memorandum of law in support of summary judgment (#108 at pp. 1–4, 15–18 and Exhibit A), which points out the substantial incompetent summary judgment evidence submitted by Plaintiffs.  The Court does not rely on any such submissions.

to the district court in an IDEA suit, . . . "the motion for summary judgment is simply the procedural vehicle for asking [the judge] to decide the case on the basis of the administrative record." *El Paso ISD v. Richard R.*, 567 F. Supp. 2d 918, 927 (W.D. Tex. 2008), *citing Heather S. v. State of Wis.*, 125 F.3d 1045, 1052 (7th Cir. 1997). *See also D.C. v. Klein ISD*, 711 F. Supp. 2d 739, 744 (S.D. Tex. 2010)(same; "The district court must 'reach an independent decision based on a preponderance of the evidence."), *citing Loch v. Edwardsville School Dist. No. 7*, 327 Fed. App'x 647, 650 (7th Cir. 2009); *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995)("Though the parties [in an IDEA action] may call the procedure 'a motion for summary judgment' . . . the procedure is in substance an appeal from an administrative determination, not a summary judgment."). "Thus even though it is termed 'summary judgment,' the district court's decision is based on the preponderance of the evidence." *Loch*, 327 Fed. App'x at 650. Therefore the existence of a disputed issue of material fact will not defeat such a motion for summary judgment. 20 U.S.C. § 1415(i)(2)(C). While the district court may take additional evidence beyond the administrative record,[6] the review here is

---

[6] *Alvin Indep. Sch. Dist. v. A.D. ex rel. Patricia* F., 503 F.3d 378, 383 (5th Cir. 2007), *citing Teague Indep. Sch. Dist. v. Todd L*, 999 F.2d 127, 131 (5th Cir. 1993).

restricted to the administrative record below.[7]

While the district court on review must give the Hearing Officer's findings "due weight," it must make an independent, "virtually *de novo*" decision based on preponderance of the evidence before it.  20 U.S.C. § 1415(i)(2)(C); *Michael F.*, 118 F.3d at 252; *R.P. v. Alamo Heights Indep. Sch. Dist.*, 703 F.3d 801, 807-08 (5th Cir. 2012).  In applying the "due weight" standard, "the hearing officer's findings are not conclusive and the court may take additional evidence and reach an independent conclusion based on the preponderance of evidence."  *Teague ISD v. Todd L.*, 999 F.2d 127, 131 (5th Cir. 1993).  Furthermore the district court does not have to defer to the Hearing Officer's findings "when its own review of the evidence indicates that the hearing officer erroneously assessed the facts or erroneously applied the law to the facts."  *Id.*  The *Teague* appellate panel quoted *Rowley*:

> "Congress expressly rejected provisions that would have . . . severely restricted the role of reviewing courts. In substituting the current language of the statute [20 U.S.C. § 1415(e)(2)] for language that would have made state administrative findings conclusive if supported by substantial evidence, the Conference Committee explained that courts were to make 'independent decision[s] based on a preponderance of the evidence.'"

999 F.2d at 131, *quoting Rowley*, 458 U.S. at 205 (quoting S. Cong. Rec. 37416 (1975)(remarks of Sen. Williams)).  Nevertheless this

---

[7] #65 and 100.  KISD has supplemented the record with citations to and copies of cases that have been issued recently. *See* #113 and 116.

preponderance-of-the-evidence standard is not "an invitation to the courts to substitute their own notion of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206. "The primary responsibility for formulating the education to be accorded to a handicapped child, and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parents or guardian of the child." *Id.* at 207.

While the court reviews a mixed question of fact and law *de novo*, "the underlying fact-findings, 'such as finding that a disabled student obtained educational benefits under an [individualized education program ("IEP")],[8] are reviewed for clear

---

[8] Under the IDEA, in providing every child with disabilities a FAPE, each school district receiving federal funds must develop and implement an individualized education program ("IEP") for each disabled student.

In Texas, the Admissions, Review and Dismissal Committee ("ARDC") is responsible for preparing the IEP. *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 247 (5th Cir. 1997), *cert. denied*, 522 U.S. 1047 (1998); 19 Tex. Admin. Code § 89.1050. The ARDC should be composed of the parents of the child with a disability, at least one of the child's regular education teachers, at least one special education teacher, a qualified representative of the school district, an individual who is able to "interpret 'the instructional implications of evaluation results,'" others, at the discretion of the parents or agency, who have knowledge or special expertise regarding the child, and when appropriate, the child. *HISD v. V.P. ex rel. Juan P.*, 582 F.3d at 580 n.1.

The IEP is a written statement prepared for implementation by the child's ARDC to address the child's individual and unique needs, based on assessments of and performance by the child. The IEP does not have to "maximize the child's educational potential," but "guarantees only a basic floor of opportunity for every disabled child, consisting of specialized instruction and related services which are individually designed to provide educational

error.'"   *HISD v. Bobby R.*, 200 F.3d 341, 347 (5th Cir.

2000)(*quoting Cypress-Fairbanks*, 118 F.3d at 252), *cert. denied*,

531 U.S. 817 (2000).  "A finding of fact is clearly erroneous when,

although there is evidence to support it, the reviewing court based

on all the evidence is left with the definitive and firm conviction

that a mistake has been committed."  *Houston Exploration Co. v.

Halliburton Energy Servs., Inc.*, 359 F.3d 777, 779 (5th Cir. 2004).

## The IDEA

The Fifth Circuit has held that the IDEA creates a presumption

that the school district's IEP is appropriate under the IDEA.

*White ex rel. White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 377

(5th Cir. 2003).  "'The role of the judiciary is not to second-guess

the decisions of school officials or to substitute their plans for

the education of disabled students with the court's.'"   *J.H. v.

Fort Bend Indep. Sch. Dist.*, 482 Fed. Appx. 915, at *2 (5th Cir.

---

benefit."  *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118
F.3d 245, 247-48 (5th Cir. 1997), *citing Rowley*, 458 U.S. at 201.
An IEP is sufficient if it "'is reasonably calculated to enable
[the student with disabilities] to achieve passing marks and
advance from grade to grade' in mainstream classes."  *Hovem*, 690
F.3d at 399 ("This is because grading and advancement in regular
classrooms monitor a child's progress , and the "system itself"
confirms the extent of the educational benefit to the child."),
*citing Rowley*, 458 U.S. at 2402.  "Nevertheless, the educational
benefit to which the [IDEA] refers and to which an IEP must be
geared cannot be a mere modicum or *de minimis*; rather an IEP must
be likely to produce progress, not regression or trivial
educational advancement."  *Michael F.*, 118 F.3d at 248. The IEP is
a collaborative effort and provides procedural safeguards to insure
that the parents and children with disabilities are involved in the
creation and implementation of the individualized program.

July 26, 2012), *quoting R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1010 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 1471 (2011). Thus the only issue for the court is whether the school officials complied with the IDEA. *Id.* Therefore the party challenging the appropriateness of an IEP because it does not comply with the IDEA or during the due process hearing before the hearing officer bears the burden of showing why the IEP and resulting placement were inappropriate under the statute. *Id.; White*, 343 F.3d at 377; *Schaffer v. Weast*, 546 U.S. 49, 57-58 (2003)(In an administrative hearing under the IDEA, the burden of persuasion is properly placed on the party seeking relief, the plaintiff); *Bobby R.*, 200 F.3d at 347. *See also White*, 343 F.3d at 377, *citing Teague ISD v. Todd L.*, 999 F.2d 127, 132 (5th Cir. 1993); *Michael F.*, 118 F.3d at 252. The Fifth Circuit has further held that "at the district court level, as at the administrative level, the party challenging the IEP bears the burden of showing that the IEP and the resulting placement are inappropriate under the IDEA." *Richardson ISD v. Michael Z.*, 580 F.3d 286, 292 n.4 (5th Cir. 2009). Thus the Woods Plaintiffs still bear the burden of persuasion here.

A student "with a disability" entitled to receive a FAPE with special education and related services under the IDEA, 20 U.S. §§ 1412(a)(1) and 1401(9), "must both (1) have a qualifying disability and (2) by reason thereof need [] special education and related

services." 20 U.S.C. § 1401(3)(A).[9]

A central goal of the IDEA is to make sure that children with disabilities "receive a 'free appropriate public education[10] that

_____

[9] The statute under the first prong lists the following as qualifying disabilities: "intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness, serious emotional disturbance . . ., orthopedic impairments, autism, traumatic brain injury, or other health impairments or specific learning disabilities." *See also* 34 C.F.R. § 300.8, defining "Child with a disability."

[10] In *Rowley*, 458 U.S. at 188, Justice Rehnquist, writing for the majority, pointed out the IDEA's express definition of FAPE:

> "The term 'free appropriate education' means *special education* and *related services* which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title. § 1401(18) (emphasis added).

The opinion continues,

> "Special education," as referred to in this definition, means "specially designed instruction," at no cost to parents or guardians, to meet the unique needs of a handicapped child, including classroom instruction, instruction in physical education, home instruction, and instruction in hospitals and institutions." § 1401(16). "Related services" are defined as "transportation, and such developmental, corrective and other supportive services as may be required to assist a handicapped child to benefit from special education." § 1401(17).

*Id.* Justice Rehnquist continued, "Examples of related services' identified in the Act are 'speech pathology and audiology, psychological services, physical and occupational therapy, recreation, and medical and counseling services, except that such medical services shall be for diagnostic and evaluation purposes

emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living.'" *Houston Indep. Sch. Dist. v. V.P. ex rel. Juan P.*, 582 F.3d at 583. KISD, as "'a local educational agency responsible for complying with the IDEA as a condition of the State of Texas' receipt of federal education funding' . . . must '(1) provide each disabled child within its jurisdictional boundaries with a 'free appropriate public education' tailored to his unique needs, and (2) assure that such education is offered . . . in the least restrictive environment[11]

_____

only.'" *Id.*, n. 10, citing § 1401(17).
        Studying the legislative history of the IDEA, in 1982 the United States Supreme Court, pointing out that "[n]oticeably absent from the language of the statute is any substantive standard prescribing the level of education to be accorded handicapped children," opined that "Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful." *Id.* 192.  It concluded that "Congress sought primarily to make public education available to handicapped children":  "Thus, the intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." *Rowley*, 458 U.S. at 189, 192.  The Supreme Court determined that "[T]he 'basic floor of opportunity' provided by the Act consists of specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child," not to maximize the potential of each handicapped child commensurate with the opportunity provided non-handicapped children. *Id.* at 200-01.  The Supreme Court further observed that the State satisfies the requirement to provide a handicapped child with a publically funded FAPE "by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction." *Id.* at 203.

[11] A primary goal of the IDEA is mainstreaming; a disabled child should not be placed in special classes except when education

-12-

consistent with the disabled student's needs.'"  *Id., citing Michael F.*, 118 F.3d at 247.   The school district does not have to "provide its disabled students with the best possible education, nor one that will maximize the student's educational potential." *Id., citing Michael F.*, 118 F.3d  at 247 (*citing Rowley*, 458 U.S. at 188-89).  "'Nevertheless, the educational benefit to which the Act refers and to which an IEP must be geared cannot be a mere modicum or *de minimis*; rather, an IEP must be likely to produce progress, not regression or trivial educational advancement'"; in

---

in regular classes with the use of supplementary services cannot be achieved satisfactorily.  20 U.S.C. § 1412(a)(5)(A)("[The] removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.").  *J.H.*, 482 Fed. Appx. at 917-18, *citing Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1044, 1045, 1039 (5th Cir. 1989), and *R.H.*, 607 F.3d at 1008.  In *Daniel*, the court created a two-prong test for an IEP in order to balance Congress's clear preference for "mainstreaming" with the actuality that general education is not appropriate for all disabled children. *Id*. at 918, *citing Daniel R.R.*, 874 F.3d at 1044, 1045.  First, the court asks "'whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily,' and if not, 'whether the school has mainstreamed the child to the maximum extent appropriate.'"  *Id., citing id*. at 1048.   Factors to be considered include (1) the efforts by the school to accommodate the disabled student in general education, (2) the degree to which the child received educational benefit from general education, and (2) the effect on the general population resulting from inclusion of the disabled student.  *Id., citing id*. at 1048-49. The importance of maximizing mainstreaming is not only the academic benefit, but the nonacademic benefit of interacting with nonhandicapped peers. *Id*.  Under the statute and the case law, schools are required to take incremental steps where appropriate, such as devising an IEP that contains both mainstream and special education courses to determine whether they benefit the student. *Id., citing Daniel R.R.*, 874 F.3d at 1050.

other words, KISD must provide its disabled students with "'meaningful' educational benefit." *Id., citing Michael F.*, 118 F.3d at 248. The decision whether a local district's IEP was appropriate under the IDEA is a mixed question of law and fact. *Michael F.*, 118 F.3d at 252.

The IEP is the centerpiece of and the primary vehicle for effecting Congressional goals under the IDEA. *Honig v. Doe*, 484 U.S. 305, 311 (1988). The IEP "sets out the disabled child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Id.*, citing § 1401(9). It must be reviewed at least annually and revised when necessary to ensure that the school district tailors the statutorily mandated FAPE to the child's unique needs. *Id., citing* § 1414(a)(5). Parental participation is essential in the development and subsequent assessments of the IEP's effectiveness. *Id.* Therefore the Act establishes procedural safeguards to guarantee parents the opportunity for meaningful input into all decisions about their child's education and the right to request review of any decisions they consider inappropriate. *Id.* Examples include the right to examine all relevant records relating to the identification, evaluation and educational placement of the child; participation in meetings concerning the child's educational placement; right to

-14-

obtain an independent educational evaluation of the child; prior written notice of any agency proposal to change the child's placement or program; an opportunity to make any complaints about the agency's actions; and the right to an impartial due process hearing for any such complaints.[12]  20 U.S.C. § 1415(b); *Id.* at 311-12.  If issues still have not been resolved, the educational agency and the parents each have the right to seek further administrative review, and subsequently if still necessary, file a civil action in state or federal court.  *Id.* at 312, *citing* §§ 1415(c) and (e)(2).

When a parent contests the appropriateness of an IEP, or whether the school district provided to the student with disabilities a FAPE, the district court should follow a two-step review, the first procedural, the second substantive: (1) it must determine whether the state complied with the IDEA's procedural requirements, and (2) decide whether the IEP was "'reasonably calculated to enable the child to receive educational benefits.'"

---

[12] Under the IDEA a parent or guardian of a disabled child may file a complaint "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child."  Such a complaint results in an impartial due process hearing, conducted according to state law.  20 U.S.C. § 1415(f)(1)(A).  In Texas, a Special Education Hearing Officer conducts the hearing under the watch of the TEA.  89 Tex. Admin. Code § 89.1151; 34 C.F.R. §§ 300.504-15.  Thereafter, a party "shall have the right to bring a civil action . . . in any State Court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy."  20 U.S.C. § 1415(i)(2)(A).  *See generally Michael Z.*, 561 F. Supp. 2d at 592-93.

*Juan P.,* 582 F.3d at 583-84, *citing Rowley*, 458 U.S. at 206-07.

Because one purpose of the IDEA is to "ensure that the rights of children with disabilities and parents of such children  are protected," 20 U.S.C. § 1400(d)(1)(B), the statute "'imposes extensive procedural requirements designed to guarantee . . . an opportunity for meaningful input into all decisions affecting their child's education . . . .'" *Alamo Heights Indep. Sch. Dist.*, 703 F.3d at 810, *quoting Buser v. Corpus Christi Indep. Sch. Dist.*, 51 F.3d 490, 493 (5th Cir. 1995)(citations and quotation marks omitted).  Among them, the parents must have the opportunity "to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of free appropriate education to such child . . . ." 20 U.S.C. § 1415(b)(1); 34 C.F.R. § 300.501(b)(1).  The statute's procedural requirements are "designed to guarantee parents . . . an opportunity for meaningful input into all decisions affecting their child's education." *Buser*, 51 F.3d at 493.  *See, e.g.,* 20 U.S.C. § 1415(b)(1)(requiring that parents of a disabled child have the opportunity "to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate education to such child.") Procedural requirements include such matters as being given proper notice of meetings, releasing test evaluations and behavior reports, and providing independent evaluation upon request. *Ruffin*

-16-

*v. Houston Indep. Sch. Dist.*, 459 Fed. Appx. 358, No. 10-20589, 2012 WL 171627, at *4 (5th Cir. Jan. 23, 2012). Nevertheless "'procedural defects alone do not constitute a violation of the right to a FAPE unless they result in the loss of educational opportunity.'" *Alamo Heights Indep. Sch. Dist.*, 703 F.3d at 810*, quoting Adam J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 812 (5th Cir. 2003)(citations and internal question marks omitted).

For the substantive prong of the *Rowley* test, the Fifth Circuit considers four factors as "indicators of whether an IEP is reasonably calculated to provide a meaningful educational benefit under the IDEA": whether "(1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment[13]; (3) the services are provided in a coordinated and collaborative manner by the key 'stakeholders'; and (4) positive academic and non-academic

_____

[13] Title 20 U.S.C. § 1412(a)(5)(A) states,

> To the maximum extent appropriate, children with disabilities . . . [should be] educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment [should occur] only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

As quoted by *Juan P.*, 582 F.3d at 585-86 (observing the IDEA's strong preference in favor of mainstreaming must be weighed in tandem with the Act's main goal of ensuring that a child be provided with a FAPE. 20 U.S.C. § 1412(a)(5)(A).)

-17-

benefits are demonstrated." *Juan P.*, 582 F.3d at 584, *citing Michael F.*, 118 F.3d at 253. "[T]hese factors are . . . intended to guide a district court in the fact-intensive inquiry of evaluating whether an IEP provided an educational benefit," and the court does not err in affording more or less weight to one than the other. *Michael Z.*, 580 F.3d at 294. The court may consider factors such as whether the IEP addresses any specific behavioral problems, any classroom modifications, seating, class placements, tutors, counseling, amount of time allowed to complete assignments, providing supplementary aids, and any other accommodations to the student's needs. Assistive technology is defined by the statute as "any service that directly assists a child with a disability in the selection, acquisition, or use of an assistive technology device." 20 U.S.C. § 1401(2); *Alamo Heights Indep. Sch. Dist.*, 703 F.3d at 812. Assistive technology includes "the evaluation of the needs of such child, including a functional evaluation of the child in the child's customary environment." 20 U.S.C. § 1401(2)(A). If needed, these services are part of providing a FAPE to a disabled student. 20 U.S.C. § 1400(d)(1)(A). Plaintiffs have charged KISD with failure to evaluate and properly diagnose Rob's dyslexia. A plaintiff contending that the school district's IEP fails to provide the student with a FAPE, an appropriate IEP, and educational benefits bears the burden of proving by a preponderance of the evidence that the school district has failed to comply with

-18-

the IDEA.  *Ruffin v. Houston Indep. Sch. Dist.*, 459 Fed. Appx. 358, No. 10-20589, 2012 WL 171627, at *1 (5th Cir. Jan. 23, 2012).

A party challenging implementation of the IEP must show that the "school board or other authorities failed to implement substantial or significant provisions of the IEP"; the failure of the local education agency "to provide all the services and modifications in an IEP does not constitute a *per se* violation" of the statute.  *Bobby R.*, 200 F.3d at 349.  Nor is it necessary for the handicapped student to improve in *every* area to obtain educational benefit from his IEP.  *Id.* at 350.  School districts are not required to cure or erase the differences between disabled and non-disabled children, but only to develop an individualized program capable of providing an educational benefit to the child. *D.B. ex rel. C.B. v. Houston ISD*, No. Civ. A. H-06-354, 2007 WL 2947443, at *11 (S.D. Tex. Sept. 29, 2007), *citing Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1047 (5th Cir. 1989); *Rowley*, 458 U.S. at 200-01 ("the intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside."). Moreover while the school district and experts may disagree over the diagnosis of a student's disability, "[t]he IDEA charges the school with developing an appropriate education, not with coming up with a proper label with which to describe [the child's] multiple disabilities."  *Heather S. v. Wisconsin*, 125 F.3d 1045, 1055 (7th

Cir. 1997).

Eligibility under the IDEA terminates with the earlier of high school graduation or the student's twenty-first birthday.   20 U.S.C. § 1412(1)(a)(2005).

The statute of limitations for a parent or school district to file for a due process hearing under the IDEA is found in 20 U.S.C. § 1415(f)(3)(C)[emphasis added by the Court]:

> A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, *or if the State has an explicit time limitation for requesting such a hearing under this subchapter, in such time as the State law allows*.

There are two exceptions under 20 U.S.C. § 1415(f)(3)(D):

> The timeline described in subparagraph (C) shall not apply to a parent if the parent was prevented from requesting the hearing due to–
>
> (i) specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint; or
>
> (ii) the local education agency's withholding of information from the parent that was required under this subchapter to be provided to the parent.

The IDEA limitations period, with its express exceptions, is not subject to equitable tolling. *D.C. and A.C. v. Klein ISD*, ___ F. Supp. 2d ___, No. H-09-1714, 2010 WL 1798943, *7 (S.D. Tex. May 5, 2010)(and cases cited therein).   The State of Texas has expressly established a shorter limitations period than that in 20 U.S.C. §

1415(f)(3)(C) in the IDEA.  Under Texas law, 19 Tex. Admin. Code §
89.1151, there is an explicit one-year time period for requesting
a due process hearing:

> A parent or public agency must request a due
> process hearing within one year of the date
> the complainant knew or should have known
> about the alleged action that serves as the
> basis for the hearing request.

If the court determines that a school district met procedural
requirements and implemented an appropriate IEP reasonably
calculated to enable the child to receive educational benefits, the
District has no further responsibility.  *Rowley*, 458 U.S. at 207;
*Michael Z.*, 561 F. Supp. 2d at 598.

If not, where a "suitable or 'appropriate' public educational
placement is not available for a disabled child within a state or
local school district, the district must pay the costs of sending
the child to an appropriate private institution." *Michael Z.*, 561
F. Supp. 2d at 598-99, *citing Michael F.*, 118 F.3d at 248, and
*School Committee of the Town of Burlington v. Dep't of Educ. of
Massachusetts*, 471 U.S. 359, 369 (1985)(concluding that the IDEA
authorizes courts to "reimburse parents for their expenditures on
private special education for a child if the court ultimately
determines that such placement, rather than a proposed IEP, is
proper under the Act").  Title 20 U.S.C. § 1412(a)(10)(C)(ii)
provides,

> If the parents of a child with a disability who
> previously received special education and related

-21-

> services under the authority of a public agency, enroll
> the child in a private elementary or secondary school
> without the consent of or referral by the public agency,
> a court or hearing officer may require the agency to
> reimburse the parents for the cost of that enrollment if
> the court or hearing officer finds that the agency had
> not made a free appropriate public education available to
> the child in a timely manner prior to that enrollment.

To receive reimbursement for private education, a handicapped student must demonstrate that (1) his placement at the public school was inappropriate under the IDEA, and (2) that his private school placement was proper under the statute. *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993). "Parents 'are entitled to reimbursement *only* if a federal court concludes both that the public placement violated the IDEA and the private school placement was proper under the Act.'" *Forest Grove School Dist. v. T.A.*, 557 U.S. 230, 246 (2009), *citing Carter* 520 U.S. 15  Even if these requirements are met, the district court retains "discretion to reduce the amount of a reimbursement award if the equities so warrant--for instance, if the parents failed to give the school district adequate notice of their intent to enroll the child in private school.  In considering the equities, courts should generally presume that public-school officials are properly performing their obligation under IDEA." *Id.* at 247, *citing Schaffer v. Weast*, 546 U.S. at 62-63. "[P]arents who 'unilaterally change their child's placement during the pendency of review proceedings, without consent of state or local officials, do so at their own financial risk.'" *Carter*, 510 U.S. at 15, *quoting School*

-22-

*Comm. of Burlington v. Dept. of Educ. of Mass.*, 471 U.S. 359, 373–74 (1985).   "An administrative decision [by the TEA Hearing officer] in favor of parents who placed their child in a private school after they rejected a proposed IEP constitutes an agreement by the state to the change the child's placement, making the new, private school placement the current educational placement of the child." *Houston Indep. Sch. Dis. v. V.P. ex rel. Juan P.*, 582 F.3d at 591, citing *Burlington*, 471 at 371–72.

The IDEA does not expressly provide parents with a private right of action for reimbursement of tuition, but in *Burlington*, the Supreme Court held that the broad grant of authority and discretion to a federal court under the statute to "grant such relief as the court determines is appropriate" includes "the power to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act."   471 U.S. at 369–70.[14]   It further

---

[14] The Supreme Court reasoned,

[T]he review process is ponderous.   A final judicial decision on the merits of an IEP will in most instances come a year or more after the school term covered by that IEP has passed.   In the meantime, the parents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate placement.   If they choose the latter course, which conscientious parents who have adequate means and who are reasonably confident of their assessment normally would, it would be an empty victory

held that parents who think that their child's IEP fails to meet
IDEA requirements may, at their own financial risk, unilaterally
remove the child from public school and place the child in private
school and then seek retroactive reimbursement of tuition from the
state.  471 U.S. at 370.

**Court's Review of the Factual Background and the Evidence**

After a careful, *de novo* review of the record, the Court
agrees with KISD's motion for summary judgment and concludes that
Rob Wood's 2006-2007 IEP and his proposed 2007-2008 IEP were
appropriate, that he was provided with a FAPE, that he was a
successful student in mainstream classes with the aid of various
IDEA accommodations and the individualized IEP, and that KISD's
motion for summary judgment should be granted and Plaintiffs'
motion denied.  While Plaintiffs complain of the IEP and its
implementation and of KISD's allegedly spotty monitoring of Rob's
school performance, the record undermines their claims.  Moreover

---

to have the court tell them several years later that they
were right but that these expenditures could not in a
proper case be reimbursed by the school officials.  If
that were the case, the child's right to a *free*
appropriate public education, the parents' right to
participate fully in developing a proper IEP, and all of
the procedural safeguards would be less than complete.
Because Congress undoubtedly did not intend this result,
we are confident that by empowering the court to grant
"appropriate" relief Congress meant to include
retroactive reimbursement to parents as an available
remedy in a proper case.

471 U.S. at 370.

even if there were occasional lapses in the implementation of the IEP and in monitoring by teachers and administrators, under the IDEA it is well established by case law that where a disabled student is mainstreamed in the regular education curriculum, he is monitored by examinations, report cards, grade advancement, and standardized tests, i.e., "the system itself monitors the progress of the child." *Rowley*, 458 U.S. at 2402.

Before Rob became a student in KISD, he was evaluated in 1999 and 2002 for special education services by the Scottish Rite Hospital (Vol. II, p. 2410) in Dallas, Texas in 1999 and by other school districts Rob had attended in Texas, Pennsylvania and New York.[15] Testimony of Diane Hodge, Certified Administrative Record ("CAR") Vol. V at 1318-1319. Rob first entered KISD in the sixth grade, in regular classes, in 2002. Following an ARDC meeting that fall, he was designated as a special education student in the area of learning disabilities and remained so until he withdrew from KISD after the 2006-2007 (his tenth-grade) school year and before the start of the 2007-2008 (his eleventh-grade) school year.

Under Texas' shortened one-year statute of limitations from

---

[15] In 1999 the Scottish Rite Hospital identified Rob as "dyslexic" based on his lack of fluency and spelling (Scottish Rite Evaluation, CAR Vol. II at 594-610; Hodge, CAR Vol. V at 1319-1320). Although he was found to have learning difficulties, he was never evaluated explicitly as "dyslexic" in the public schools he attended. Arbruster Evaluation, CAR Vol. III at 2402; West Grove Evaluation, CAR Vol. III at 2428; Pittsford Evaluation, CAR Vol. III at 2442.

the date the complainant knew or should have known about the alleged action that is the basis for requesting a due process hearing before a TEA Hearing Officer, 19 Tex. Admin. Code § 89.1151,[16] the relevant period for Plaintiffs' IDEA claims is September 12, 2006-September 12,2007.

KISD first evaluated Rob in 2004, incorporating all his previous evaluations into that evaluation, as well as into a subsequent evaluation performed by KISD in 2007.  KISD 2004 Evaluation, CAR Vol. III at 1368-1402; KISD 2007 Evaluation, CAR Vol. III at 1410-1443; Testimony of Diane Hodge, CAR Vol. V at 1318-1337 and 1338-1348.  Rob was also privately evaluated in the summer of 2007 by Dr. Robert Hampson of Southern  Methodist University, but Plaintiffs did not provide that evaluation to KISD. Hampson Evaluation, CAR Vol. IV at 4697-4713; Testimony of Fred Shafer, CAR Vol. V at 1787.

Rob's 2004 evaluation revealed a gap between his tested intelligence and his tested achievement in written expression, basic reading skills, and math calculation.  KISD 2004 Evaluation, Vol. III at 1390.  Nevertheless he performed above average in all of his mainstream classes.  He did not qualify as a student with dyslexia under the evaluation established in 2004's Texas Dyslexia

---

[16] *See also* 34 C.F.R. § 300.507 and 300.511(f); *D.C. v. Klein Indep. Sch. Dist.*, 711 F. Supp. 2d 739, 745 (S.D. Tex. 2010)(holding that parents' claims arising out of an ARDC meeting and the IEP developed at the meeting were time-barred.).

Handbook.  KISD 2004 Evaluation, CAR Vol. III at 1368-1403; 2004

Dyslexia Handbook, CAR Vol. IV at 3995-4051[17]; Testimony of Diane

Hodge, CAR Vol. V at 1320-1327.   The ARDC classified him as

learning disabled and eligible for educational services, so it

designed an individualized IEP for him.  KISD 2004 Evaluation, CAR

Vol. III, at 1368-1403; Testimony of Diane Hodge, CAR V at 1335.

---

[17] A clinical neuropsychologist and expert in the area of
assessment, Dr. Bonnie Brookshire reviewed the evaluations of Rob
by KISD in 2004 and 2007.  She testified that the 2003 testing was
appropriate for dyslexia, that in Texas the Dyslexia Handbook
published by the TEZ governs the diagnosis and assessment of
dyslexia, an impairment which is categorized as a "reading
disorder."  She identified the tests used by KISD to evaluate Rob
and testified that they met the Texas criteria for testing for
dyslexia and that Rob is not dyslexic.   Testimony of Dr.
Brookshire, CAR Vol. V at 264-268, 272-277, 317-320. Psychologist
and expert Dr. Gail Cheramie, an Associate Professor of the School
Psychology Program at the University of Houston-Clear Lake, after
reviewing the record of all evaluations and tests, also testified
that Rob was not dyslexic under the testing guidelines of the TEA.
CAR Vol. V at 1678-1683.  Dr. Brookshire and Dr. Cheramie further
stated that it was not necessary to reconfirm the 2004 findings in
2007.  Testimony of Dr. Brookshire,  CAR Vol. V at 264-268, 272-
277, 317-320; Testimony of Dr. Cheramie, CAR Vol. V at 1678-1683.

    Diane Hodge, an appraisal specialist, testified that under
Texas criteria in 2004, a "reading disorder" was any deficiency
between cognitive functioning and reading skills:  the TEA Dyslexia
Handbook identified as specific impairments accompanying and
suggesting the existence of dyslexia difficulty in reading words in
isolation, decoding nonsense word, slow and inexact oral reading,
lack of fluency while reading, and problems learning to spell.  In
the tests Rob was given, Rob did not evidence these
characteristics.  Because under Texas law dyslexia is a disorder of
constitutional origin and because in 2004 Rob showed that his
cognitive abilities were not impaired, Hodge, too, testified that
it was not necessary to test again for dyslexia in 2007.  CAR Vol.
V at 1310-1434.

    Furthermore Rob's parents declined an opportunity for KISD to
reexamine Rob for dyslexia in August 2007.  ARD/IEP 8/16/07 CAR
Vol. III at 1940-1941.

In 2005 Rob became a 9th grade student in KISD's Seven Lakes High School, still enrolled in regular classes, but provided with special education support from a special education teacher in his English, Algebra, World Geography and Biology classes.[18]  ARD/IEP 4/25/06, CAR Vol. III at 1736-1739.  His 9th grade accommodations were described to some degree in the IEP designed for Rob on April 25, 2006.  ARD/IEP 4/25/06, CAR Vol. III at 1736-1739; R.W. School Transcript and Grades CAR Vol. III at 2118; TAKS Scores, CAR Vol. III at 2118, 2125.  Furthermore he received above-passing grades in all his classes; he also passed the Texas Assessment of Knowledge and Skills (the "TAKS" test).  *Id.*  He was additionally accommodated with access to spelling devices, adaptive devices, frequent feedback and prompts, clearly defined and consistent limits, and positive reinforcement, and he participated in and received extra tutorials during a study hall program called "Spartan Support."  ARD/IEP 4/25/06, CAR Vol. III at 1736-1739; Testimony of Deborah Atchison, CAR Vol. V at 870, 874-875, 891, 892; Academic Transcript and Grades, CAR Vol. III at 2118-2124. His academic achievements were correctly matched by his grades. Cumulative Grades by Teachers, 10th grade, CAR Vol. III at 2029-2104; Academic Transcript and Grades, CAR Vol III, at 2121.  He finished tenth grade with a ranking of 302 out of 559 regular

---

[18] This year's IEP was prepared and implemented beyond Texas' one-year limitations period for requesting a due process hearing under 19 Tex. Admin. Code § 89.1151

education students, with a grade point average of 3.33.   E-mail from principal Christie Whitbeck to F. Shafer, CAR, Vol. III at p. 2112; Academic Transcript and Grades, CAR Vol. III at 2121.

Between April and May 2006, toward the end of Rob's ninth grade year, there was an ARDC meeting with Rob's parents and all staff members required by the statute to design Rob's IEP program for Rob's tenth grade year.  John and Rene Woods agreed to the proposed program, which was to be put in place from September 12, 2006 until Rob withdrew shortly after August 16, 2007.  ARD/IEP 4/25/06 and 5/17/06, CAR Vol. III at 1729 and 1768.  The annual goals of this IEP in Rob's tenth grade year (2007-2007) were to master the Texas Essential Knowledge and Skills ("TEKs") in all his academic classes, with IDEA accommodations to be evaluated by teacher observation, work samples, and grade reports.  ARD/IEP 5/17/06, CAR Vol. III at 1757-1758.  Rob's short-term goals for study and organization skills were raised from 70% completion expectations to 85% completion expectations to heighten the challenge.  *Id.* at 1767.  He was to continue to receive special education instruction by special education teachers in his regular classes for English, Integrated Physics & Chemistry, World History, and Geometry, with certain accommodations in all of his classes, including athletics.  *Id.* at 1759-1760.  Weekly progress reports about his performance were to be sent home by his special education case manager, Nancy McCanlies.  Documents from McCanlies to Wood,

CAR Vol. IV, generally 3674-3757.  In addition, reports on his
progress on his IEP goals were regularly provided.  CAR Vol. III at
1957-2028.  Rob was successful in his school performance.  Progress
Reports, CAR Vol. III, pp. 1949-1956; Contact Hours, CAR Vol. III,
at pp. 1957-2028; Cumulative Grades in 10th grade by Teachers, CAR
Vol. III at pp. 2029-2104; Student Profile, CAR III, at pp. 2105-
2117; Academic Transcript and Grades, CAR Vol. III and 2118-2124;
TAKS results, CAR Vol. III at 2125-2162; Documentation from Nancy
McCanlies, CAR Vol. IV at pp. 3875, 3877, 3879, and 3910.

There is also evidence of regular communication among the
school staff, McCanlies, and the Woodses about Rob's progress.
Documents from McCanlies to John and Renee Woods and the
Instructional Staff, CAR Vol. IV at (generally) 3674-3758;
Documents to McCanlies from Parents and Instructional Staff, CAR
Vol. IV at (generally) 3759-3994; Testimony of Assistant Principal
Bill Roberts, CAR Vol. V at 1020-1022.

During his tenth grade year Rob began playing extracurricular
football, outside of his IEP and his special education program.
After he missed some practices and his coach, Kevin O'Keefe,
recommended in September 2006 that he transfer to track, Rob's
father became angry that his son was "kicked off" the football team
and voiced complaints at multiple ARDC meetings that year.  ARD/IEP
1/08/07, CAR Vol. III at 1872; ARD/IEP 10/26/06, 11/13/06, and
12/7/06, CAR Vol. III at 1772, 1795, and 1820, respectively  The

record, however, shows that in a private meeting with his coach, Rob indicated that he wanted to quit, but said otherwise when his father was around.  CAR Vol. V at 1593-1594.  Furthermore football is an optional, extracurricular activity and, contrary to Plaintiffs' claims, not a program in Rob's IEP nor necessary for Rob to benefit from school or to receive a FAPE.  ARD/IEP 1/08/07, CAR Vol. III at 1872.  Furthermore, when Rob was offered the chance to continue to play football, he rejected the offer.  *Id.* at 1595; Testimony of Head Football Coach Kevin O'Keefe, CAR Vol. V at 1599. John Wood conceded that Rob was given the opportunity to rejoin the football team.  CAR Vol. V at 728-729.  Rob did join the varsity and junior varsity track and field in the spring of 2007.  ARD/IEP 12/07/06, CAR Vol. III at 1841; Testimony of Track Coach Marvin Rathke, CAR Vol. V at 1522.

In October 2006, purportedly because of such problems, Plaintiffs requested that Rob be transferred to Taylor High School Testimony shows that Taylor High School was a "closed campus," i.e., one denying transfers in because it had reach its student capacity.  Testimony of Assistant Principal Bill Roberts. CAR Vol V, at 1012-1013; Testimony of Deborah Atchison, CAR Vol. V at 866. Accordingly at first KISD denied the request.  After the parent appealed and the transfer was granted, Plaintiffs decided not to take it after all.  ARD/IEP 12/07/06 CAR Vol. III at 1843.

During his tenth grade year, however, Rob began using

-31-

marijuana.   Around April 2007 he was evaluated and treated by a private psychiatrist, Dr. Guerrero, but the records were not shared with KISD.   Guerrero Evaluation, CAR Vol. III, at 2392-2401; Testimony of Diane Hodge, CAR Vol. V, at 1348-1349.   Nevertheless, Rob continued to perform well in school.

In 2007 Rob was re-evaluated by KISD and Diane Hodge for eligibility for special education services.   KISD 2007 Evaluation, CAR Vol. V at 1185.   He had passed all of his TAKS tests.   English Language Arts (2146); Math (2177); Science (2185); and Social Studies (2195). CAR, Vol III at 1411.   He was given intelligence and adaptive behaviors scales, academic achievement tests, and detailed evaluation instruments to assess his reading abilities. *Id*. at 1404-1419.   For the first time, under new 2006 IDEA regulations, 34 C.F.R. § 300.309(a)(1)(v), established by the U.S. Department of Education, Rob was tested in 2007 for learning disability eligibility in reading fluency and was identified as learning disabled in that area.   Testimony of Deborah Hodge, CAR Vol. III at 1341-1342; Testimony of Dr. Gail Cheramie, CAR Vol. V at 1693.   Rob's scores in written expression had improved and he no longer qualified as learning disabled in that area.   Testimony of Deborah Hodge, CAR Vol. V at 1340; KISD 2007 Evaluation, CAR Vol. III at 1415.   Deborah Hodge reviewed Rob's previous evaluations for dyslexia, as defined under the TEA guidelines, including the 2004 evaluation finding he did not have that condition, and decided it

-32-

was not necessary to test him again for that impairment, and his parents did not request that it be done.  Testimony of Deborah Hodge, CAR Vol. V at 1342; KISD 2007 Evaluation, CAR Vol. III at 1404-1408.  On December 7, 2004, John and Renee Woods agreed to and signed his proposed evaluation plan, which indicated the areas to be assessed.  KISD 2007 Evaluation, CAR Vol. III at 1409; Testimony of John Wood, CAR Vol. V at 689.   All the expert witnesses testifying about this evaluation stated that it was professionally appropriate.   Testimony of clinical neuropsychologist Dr. Bonnie Brookshire, CAR Vol. V at 275-276; Testimony of Deborah Hodge, CAR Vol. at 1348, 1407, 1409; Testimony of Dr. Gail Cheramie, CAR Vol. at 1690-1695.  This 2007 evaluation satisfied all requirements for a complete reevaluation under the statute and Rob was throughly reassessed in all required areas.  KISD 2007 Evaluation, CAR Vol. III at 1411, 1417, 1420, 1428; Testimony of Dr. Brookshire, CAR Vol. V at 276; Testimony of Deborah Hodge, CAR Vol. V at 1338-1343; Testimony of Dr. Cheramie, CAR Vol. V at 1691-1693.  Because of Rob's high performance in class and acceptable performance on the Taks tests, the evaluation did not decide his eligibility for special education, which was left for the ARDC.

In the Spring of 2007, Rob's parents and the ARDC met to plan Rob's IEP for the 11th grade, 2007-2008, and decided to continue his eligibility for special education.  ARD/IEP 5/21/07, CAR Vol. at 1922.  Given his better performance in school and on standardized

tests, the plan proposed he be given in-class support in two, instead of four, core academic classes and instruction in a reading improvement class, Read 180, which was given to dyslexic students and also to Rob pursuant to his parents' request. ARD/IEP 8/16/07, CAR Vol. III at 1923, 2939; Testimony of Dr. Brad Reitz, CAR Vol. V at 1750-1755. They also discussed the question of a dyslexia label for Rob and related special services, but it was explained that Rob did not meet the TEA requirements for dyslexia services. ARD/IEP 8/16/07, CAR Vol. III at 1922, 1940-1941. Nevertheless KISD offered to test Rob again for dyslexia and to pay for an independent educational evaluation, but his parents refused. *Id.* at 1940-1941.

Unknown to KISD at the time of this final ARDC meeting, instead of following through with the IEP at KISD for Rob's eleventh grade year, his parent had contacted and enrolled him in the residential Pine Ridge School in Vermont for disabled students. Testimony of Jean Foss of the Pine Ridge School, CAR Vol. V at 669; Testimony of Wood, CAR, Vol. V at 786. Pine Ridge School offered instruction under the Orton-Gillingham approach, which KISD's experts testified was "inappropriate" for Rob's age and level. Testimony of Dr. Brookshire, CAR Vol. V at 310, 312; Testimony of Deborah Hodge, CAR Vol. V at 1361; Testimony of Dr. Cheramie, CAR Vol. V at 1702, 1728-1729. His performance there was similar to his previous achievements at KISD. Table of Standardized Test

Scores, CAR Vol. IV at 4691.

John and Renee Woods seek reimbursement for their private
school costs for Rob at Pine Ridge.  They offered no evidence of
their expenses other than a $50 application fee and no expert
testimony about Rob's classroom performance there.  The Court finds
that Plaintiffs have not shown that KISD violated procedural
requirements of the IDEA nor that his individualized IEP was not
reasonably calculated to enable him to receive meaningful
educational benefits.  Thus his placement at KISD was not
inappropriate under the IDEA, and he is not entitled to tuition
reimbursement for his subsequent placement at the private Park
Ridge School for students with disabilities in Vermont.  As stated
by the Fifth Circuit in *R.H.*, 607 F.3d at 1014-15,

> The IDEA . . . makes removal to a private school
> placement the exception, not the default.  The statute
> was designed primarily to bring disabled students into
> the public educational system and ensure them a free
> appropriate *public* education.  Courts should therefore be
> cautious before holding that a school district is
> required to place a child outside the available range of
> public options.  [emphasis in original]

Evidence shows that Rob was a popular, well-liked student at
KISD.  Testimony of Bill Roberts, CAR Vol. V at 1006, 1024;
Testimony of Rebecca Greene, CAR Vol. V at 1080[19]; Testimony of Dan

_____

[19] Rebecca Greene was Rob's case manager and his 9th and 10th
grade co-teach English teacher, coordinating her work with that of
his regular education English teacher, Lydia Dennis, and that of
his case manager, Nancy McCanlies.  She testified that special
education modifications made for Rob in the classroom included a
word processor when necessary, modification of the format of tests

Miller, CAR Vol. V at 1254[20]; Testimony of Martin Rathke, CAR Vol.
V at 1535.  He took courses that prepared him for college and was
on track for graduating with 24 credits completed.  Testimony of
Deborah Atchison, CAR Vol. V at 870-71; ARD/IEP 10/26/06, CAR Vol.
at 1872.

### Court's Decision

     As a threshold matter, the Court agrees with KISD as a matter
of law that Plaintiffs do not have a claim under the Texas Dyslexia
Act, Tex. Educ. Code § 38.003, which does not provide a private
cause of action, and under its implementing regulation, 19 Texas
Administrative Code § 74.28.  These provisions do not relate to
special education for disabled children in Texas.  *See* KISD's
amended motion, #103 at pp. 46-50.

     Nor is there any evidence in the record to support Plaintiffs'
claims of retaliation.  *Id*. at 45-46; KISD's Objections, #108 at

---

but never of their content, audio texts, study guides and study
reviews, and powerpoints.  She stated that his examination grades
were accurate, that he was able to evaluate, synthesize, and
analyze at  a high level, and that he kept up with his school work.
CAR, Vol. V at 1074-1176.
     Lydia Dennis, Rob's regular education English teacher, also
testified that Rob was doing 10th-grade-level work, that Rob's tests
were modified in format, but never in content, and that he
progressed in her class and was capable of college work.  CAR Vol.
V at 1435-1507.

[20] Dom Miller, Rob's regular World History teacher, testified
that Rob was a competent reader, never made below a "B," used 10th-
grade-level textbooks and reading material, and performed at the
10th grade TEKS level.  Miller coordinated his work with that of
Rob's special education instructor Mr. McIlvain.

pp. 11-12.

As noted, the two key issues on an appeal of the Hearing Officer's determination that Rob's IEPs at KISD were appropriate and provided Rob with meaningful educational benefits and a FAPE are (1) whether the state complied with the IDEA's procedural requirements[21] and (2) whether the IEP was reasonably calculated to enable Rob to receive educational benefits.[22] *Michael Z.*, 580 F.3d

_____

[21] *See generally,* 20 U.S.C. § 1415.  For example, § 1414(b)(1) identifies as required procedures,

> An opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent educational evaluation of the child.

Moreover, as noted *supra*, while a procedural violation by itself may support a "finding that, as a matter of law the school has failed to provide" a FAPE, to be actionable, the procedural violation "must result in the loss of an educational opportunity." *Adam J. v. Keller Indep. Sch. Dist.*, 328 F.3d 804, 811 (5th Cir. 2003), *citing Buser by Buser v. Corpus Christi Indep. Sch. Dist.*, 51 F.3d 490, 493 (5th Cir. 1995).

[22] At meetings attended and participated in by Rob's parents, who were given notice of their procedural safeguards and who played a significant role in creating the IEPs along with teachers, other school personnel and educational experts.  Individualized IEPs are developed by agreement and contain a statement of the special education, related services, and accommodations that the school district must provide to the child with disabilities.  20 U.S.C. § 1414(d)(1)(B) and (A); *Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 395 (5th Cir. 2012).  The school district must then implement the IEP and periodically review them, as KISD did here.  *Hovem, id.* Parents must be, and were here, allowed to raise any complaints they have to the identification, evaluation or placement of the child or to whether the child was receiving a FAPE as required under 20 U.S.C. § 1415(f)(3)(E)(i).  *Id.*  If the parents are not

-37-

286 at 293, *citing Rowley*, 458 U.S. at 206–07.

There is no dispute that KISD complied with the IDEA's procedural requirements from September 12, 2006 through September 12, 2007, the relevant one-year limitations period under 19 Tex. Admin. Code § 89.1151, covering his 10th-grade and proposed 11th-grade IEPs, so the Court addresses the second prong.

The Court finds no clear error in the Hearing Officer's fact findings and concludes, based on its *de novo* review of the administrative record, that KISD has shown by more than a preponderance of the evidence that Rob's 2006-2007 and proposed 2007-2008 IEPs were reasonably calculated to enable him to receive some educational benefit, as is evidenced *inter alia* by his passing 10th grade and advancing to 11th grade. The four factors to be considered in this decision are (1) whether the IEP was individualized to Rob based on his evaluations, assessments and performance; (2) whether the IEP was administered in the least restrictive environment; (3) whether services were provided in a coordinated and collaborative manner by the key stakeholders; and (4) whether positive academic and nonacademic benefits were

satisfied with the school district's effort to resolve any issues, they may request an impartial due process hearing before an independent, state education agency Hearing Officer pursuant to 20 U.S.C. § 1415(f)(1)(A).  *Id.*  If still aggrieved after exhausting these administrative procedures, the parents and child may "bring a civil action with respect to the complaint" in state or federal court under 20 U.S.C. § 1415(i)(2)(A).  *Id.*  The Woodses have pursued these administrative procedures all the way to judicial review, here.

achieved.  *Michel F.*, 118 F.3d at 253.  The Court addresses each factor in turn.

1.  The IEPs were reasonably calculated to enable Rob to achieve more than passing marks and standardized test scores in regular education classes with special education accommodations where needed, and to advance from grade to grade.  Despite John and Renee Woods' continuous complaints and disagreement about his program, Rob's record (including grades and test scores), the evaluations of expert witnesses and his teachers's testimony demonstrate that he clearly progressed and enjoyed meaningful educational benefits during his time in KISD.  His mainstream placement provided him not only with academic benefit, but with the benefit of interaction with nondisabled peers and nonacademic benefit of participating in the affairs of the community in which he resided, benefits that he was denied when he transferred to the Pine Ridge school for disabled students in Vermont.  *Teague*, 999 F.2d at 132.  The testimony of KISD's expert witnesses, teachers, and administrators all attest to the fact that the IEPs were reasonably calculated to and did provide Rob with a meaningful educational benefit under the IDEA.  Numerous experts testified that KISD's evaluations were thorough and competent, and that KISD provided established, professional reasons why a second evaluation for dyslexia in 2007 was not required; it did evaluate Rob's reading disability in 2007 and responded to his identified problems in reading fluency with

-39-

accommodations in the IEP.

2.   Rob's 2006-2007 IEP and his proposed 2007-2008 IEP both
utilized the least restrictive environment.   In both he was
mainstreamed into regular classes in all subjects, but in those
where he needed special education accommodations he was provided
*inter alia* with special education teachers, spell-check, calculator
and other devices, shortened assignments, increased time to do
assignments, Read 180 program, positive feedback and reinforcement,
and optional tutorials during the Spartan Support study halls.   In
the second IEP where his teacher evaluations and test scores
demonstrated his improvement, the number of accommodations was
accordingly reduced.

3.   As supported by the record, Rob's special education services
were provided in a collaborative and coordinated manner by the key
stakeholders.   As noted, the statutorily required participants
attended all the ARDC meetings, and Rob's parents were fully
informed about his status throughout his enrollment in KISD.   The
record is replete with emails and other means of communication
demonstrating that KISD and the Woodses developed Rob's IEP over
numerous meetings in a collaborative and coordinated manner in
meetings with ARDC, staff, and administrators.   The meetings
addressed any concerns or complaints Rob and his parents raised,
ranging from alleged dyslexia to matters outside of the IDEA, such
as his participation in football and track. Plaintiffs complained

at various times about his teachers and school administrators'
inadequate communications with them, and their complaints were
addressed at follow-up meetings from the end of December 2005-2006,
leading to the development of a communications plan.  When the
Woodses barraged, indeed harassed, the teachers with critical
emails, however, Principal Christie Whitbeck informed John Woods by
letter that Plaintiffs should no longer communicate directly with
Rob's teachers, but should address all requests for information
about Rob to her or to assistant principal William Roberts.  The
record demonstrates that regular reports to the parents regarding
Rob's progress were made.  Testimony of Deborah Atchison, Vol. V at
867-868; email from John Wood to Nancy McCanlies, CAR Vol. II at
931; Progress Reports, CAR Vol. III at 1949-1952; and Contact
Hours, CAR Vol. III at 1957-2026.  The evidence undermines
Plaintiffs' claims that the communication problem was not resolved.
Moreover, as noted, KISD was not required by the IDEA to defer to
the parents' demands for a particular method of addressing their
son's learning disabilities.  *White v. Ascension Parish Sch. Bd.*,
343 F.3d at 380 (The parents' "right to provide meaningful input is
simply not the right to dictate an outcome and obviously cannot be
measured by such."), *citing Blackmon*, 198 F.3d at 656 (where there
is no "serious hamper[ing]" of a parent's opportunity to
participate in the formulation process, the IDEA requirement of
meaningful parental input is satisfied notwithstanding that

parent's desired program was not selected), and *Lachman*, 852 F.2d at 297 (7th Cir.)("[P]arents, no matter how well-motivated, do not have a right under [the IDEA] to compel a school district to provide a specific program or employ a specific methodology in providing for the education of their handicapped child."), *cert. denied*, 488 U.S. 925 (1988).  Meanwhile, as indicated, the teachers and administrators testified that they worked collaboratively with each other in implementing Rob's IEP.  When Rob's parents withdrew Rob from KISD, enrolled him in the private Pine Ridge School, and requested reimbursement, a due process hearing was provided to them before a TEA Hearing Officer, and now judicial review by this Court.

4.  In *Hovem*, the Fifth Circuit held that in an appeal of a hearing Officer's decision, the district court must take a "holistic perspective" and that the meaningful "educational benefit" for which the IEP and the IDEA aim is the "overall educational benefit, not solely disability remediation."  690 F.3d at 397-98.

Because the Court finds that in an appropriate educational placement KISD developed and implemented proper, individualized IEPs for Rob based on his evaluations, test results, and performance, found suitable by expert witnesses, and provided him with a FAPE that met his unique needs and prepared him for further education, and because the Woodses withdrew Rob and enrolled him in Pine Ridge, a private school for children with disabilities,

without appropriate notice to KISD, the Court finds that the Woods are not entitled to reimbursement for that private school's tuition.

For these reasons the Court AFFIRMS the Hearing Officer's decision and

ORDERS that KISD's amended motion for summary judgment (#103) is GRANTED and the Woodses' amended motion for summary judgment (#102) is DENIED.  A final judgment will issue by separate order.

**SIGNED** at Houston, Texas, this __30th__ day of __September__ , 2015.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE